May I please record? Let me say before you let those two... We obviously gave this your time. That decides if you're compelled to use all of the extra-general data. But as you can see we don't break the clock. Anyhow, this case obviously has a great deal of interest. Not just legally but practically to that community, the folks in the schools, the kids. And so we wanted to make sure that we gave it a full hearing and nobody thought that we were cutting off an argument or a presentation because the LED stood out. We're doing tonight as opposed to a few years ago. I appreciate that very much, your honor. May you please record. I'd like to reserve 10 minutes for rebuttal. When Congress passed Title IX, it prohibited sex discrimination in schools but maintained separate spaces for boys and girls. Sex under Title IX in our case law has to do with anatomical differences between men and women based on their reproductive nature. Congress was not dealing with a very different concept of gender identity. Do you think they thought of it? Do you think Congress was in line when they passed the Title IX? No, I don't think it was in their minds. And I think it cuts that direction. What about Justice Scalia's statement? I can't remember what case he came from. I'm sorry. I'm calling. And certainly Congress's pronouncements can mean a lot more than what they had intended in their mind, but were still governed by the law itself. So the principle is, what does the law do with regard to Title IX and what is the case law then with regard to the Constitutional right to bodily privacy? Can you read Price Waterhouse into that? Certainly. Price Waterhouse, of course, dealt with discrimination against a woman because she was not considered feminine enough. And so that stereotype then was considered to be, I think, an extension of sex discrimination under Title VII. The logical counterpart in that would be if there was a girl in the school who was considered too masculine to be able to use the girl's facilities, it would be a Price Waterhouse violation to prevent that girl from using those facilities. So at the end of the day, Congress in Title IX was talking about sex and protections on the basis of sex, and our case law has been clear that when there are real differences between men and women that are relevant to the case at hand, that's what should be taken into account, not mere stereotypes themselves. And so physical differences or bodily differences have been considered to be relevant. For instance, the United States Supreme Court in the VMI case, when they were ending discrimination on the basis of sex in an entry to the Virginia Military Institute, at the same time Justice Ginsburg stated that alterations were necessary in order to afford members of one sex privacy from membership of the opposite sex. And we're clearly thinking about the different physical differences between men and women because that's the language they used, language that she stated. This policy, you can go back to the policy that your clients are complaining about, this policy applies to everybody. All sexes are treated, biological sexes are treated the same. That's correct. So how is this in contravention of Title IX if everybody's treated the same? Including gender identification. Yeah. So girls are identified in that. The terminology is very, very tricky, and I don't want to be rude in front of anyone, so many people don't know I said this, but I think you understand what I'm saying. And males who identify as being boys are treated the same as boys who identify as being girls. Well, actually, that's not entirely true. So a student who's transgender has the choice of asking the school and using the facilities of the opposite sex. So that's what I'm saying. It's the opposite sex that complicates the discussion. Well, actually, I do want to use that language to be clear. It's not clear at all. At least in my mind, that does not enhance the clarity. If I hear the term transgender boys, transgender girls, then I can get my head around that and say what we're talking about. Well, I guess I'd like to draw the Court's attention then as a preliminary matter to what the expert said in this case. Appellee's expert stated that sex has to do with their anatomical differences. Gender identity has to do with, as he put it, our subjective beliefs about gender. And those terms stand in contradistinction because transgender wouldn't make any sense apart from the sex world. Yeah, but it wouldn't be since you're in my house, our house, and you're out of tuition to pay for it. Unless you have a children's home and you do that, it makes the mindset of the mind, most conducive to understanding, and the most respectful to the persons involved here. Transgender boy tells me what we're talking about. Transgender girl tells me what we're talking about. I know for reasons beyond my comprehension, and I would approve of those terms, but I would like to use those terms, but it greatly enhances the communication. I will obviously do my best, Your Honor. The difficulty is that so many different cases turn on what the nature of sex is and what opposite sex means. And I guess, I guess... That's not a great new term. Instead of the word vision, you're going to use the term sex. I think that's going to be a complicated expression. It's not that simple. That's why I use the term transgender girl, transgender boy, to try to get around that problem. I appreciate, I appreciate that, Your Honor. And I'm not trying to be difficult. I will, I will do my best. But when the court, when the Supreme Court, and when Congress has been using the terminology about sex, it's been talking about the bodily differences that are relevant. And so if I could draw the court's attention to the non-religious... You're saying the sex to which one identifies is not relevant, you're saying? It's not irrelevant to the discussion, but when the court has been talking about what sex means, it's been talking about the anatomical differences, the bodily differences that aren't mere stereotypes, but are relevant to these discussions. And so from a very fundamental level, what we're coming here to talk about today is bodily privacy, which turns... Are we going to Title IX now? We're going to bodily privacy? Because Title IX has a statutory language that says you're not supposed to discriminate based upon sex. Your argument is sex is a biological state of affairs. I understand your position on that. That's your position. But everybody is being treated the same under the school's policy. Transgender students and the biological students, from your point of view... You're going to use your words just for this minute because I'm with Justice Keeney. You have to use language that's here. Everybody's treated the same. I don't understand how you could have a Title IX claim here. No, everyone is treated the same. So, a transgender boy can use both the boys' facility or the girls' facility. A transgender girl can use both the girls' facility or the boys' facility. If that were true, and you're trying to cross ways to the body language suggesting they don't agree with that, but if that were true, then we'd still have a classification that does not rise to the level of sex discrimination when you're under Title IX? Well, under Title IX, included within sex discrimination is harassment on the basis of sex. We understand that there can be harassment on the basis of sex when there's somebody who has the opposite body type in that setting. And so, we would certainly understand... So, in your presence of an individual, now we're leaving the statutory sex discrimination. You're moving now to the hospital environment argument? Yes, Your Honor. And so, I understand, for instance, a male maintenance worker being told that he can enter the girls' locker room to fix the locker while the girls are changing. And a school would not... While the girls are changing? And you're both advocating this. Well, that's not in this case, many of us. No, but I'm trying to use a hypothetical to understand how this would work. So, a school would not tell a male maintenance worker that he can enter, not because he thinks a male maintenance worker is going to do some kind of bad act or that they hate the male maintenance worker, but the presence of a male in this female setting while they're changing would constitute sexual harassment. We get that as well from... Wait, wait, wait. You have that hypothetical. How do you understand what you're saying? You're saying the presence of a male maintenance worker to fix the locker while the girls are changing would constitute sexual harassment. Yes. If he's talking to himself, it should constitute harassment. And the... We have... Well, it's wrong. The presence of a male custodian who has to harm his job function while girls are changing in and of itself is harassment. Because of the bodily privacy at issue for the girls. No, I don't mean the right of privacy. Well, no, because sexual harassment can turn on bodily privacy concerns. So, in Lewis v. Tribal Bridge, for instance, the Second Circuit found that there was sexual harassment... Because the employees were warming up against females in the room where they were going to be changing. Well, the court... There were other bad acts that would occur as well, but the court said specifically entering the women's locker room when the female employees were undressed constituted specific acts of sexual harassment. How many times did they enter? I think it was five times. It was a crisis. Well, but we know pervasive... Because we can't ignore the pervasive or severe components of this. That's right. The single presence of the maintenance worker has to be severe or pervasive. Sure. And no one needs to be severe or pervasive under a new Third Circuit precedent. But here we're dealing with a policy. If the employer in Lewis v. Tribal Bridge had a policy that said, men, you can go in any time you want to, we would understand the pervasiveness of that because it would be inviting the very conduct that was being complained of. Here we actually have a policy that is inviting the very conduct that we're concerned about. So it happened for two of our clients that they were changing while there was somebody there of the opposite sex, and it can happen any time these students go back in and use the facility. My client, Mary Smith, anytime that she were to use the locker room or the restroom, risks going in there and seeing someone of the opposite sex changing or being caught while she's changing by someone of the opposite sex. And so that mere event, from your point of view, is enough to constitute severe or pervasive hostilities. Under Lewis. Yes. And it's because... We just saw facts in Lewis that not only was the male employee inside the entrance to the female locker room, as I said earlier, they brushed up against the female employees, and a supervisor, when the employees complained, the supervisor referred to them as the C-Word and called them the biggest bunch of effing cry-babies. There certainly were a lot... You're right, you're right. There certainly were a lot of other bad acts. Those were sexual harassment as well. But the court was clear that the entry, that the mere entry itself was... In this case, now that I'm going to have the opinion in front of me, did the court even suggest, going back to the language from the prior argument, that a single instance of a male going into a female locker room under your scenario to reform his job functions would create a hostile environment? That's what you said. Yes, yes, Your Honor. And, you know, because if they're going there because the employer is telling them to go there, it's not as if... In some of these types of cases, for instance, you're trying to establish some kind of practice to pin liability on an employer, and so you're looking for a whole pattern of activity so you can say, well, if the employer knew about it, the employer didn't do anything about it, therefore the employer is liable. The pattern is not just to attach liability, it's to bring the conduct within the language of the statute. That's where the environment comes from. The environment comes from the pattern, not from the single entrance. Well, here the pervasiveness comes from the policy itself, which is explicitly inviting folks of the opposite body type, if you will, to come to the setting when it's being used by others to change completely, and the common areas of the locker rooms and the restrooms, which we understand from the facts of this case, are used to change, not just... So does it invite all folks in, or just folks who identify with the same gender, if you will, of the people who would normally be associated with that space? Well, of course it's the latter, yes. It's not everybody coming in, but the right to bodily privacy and the sexual harassment turn on whether there's somebody of the opposite body type. As far as I saw in your brief, or maybe in the argument of the district court, a concession that the clients would not have a problem if somebody would actually go on to sex reassignment surgery and physically change if they were present in the locker room, even though they would then have a sex, and I use the term sex there, that was inconsistent with the sex designated on the birth certificate. In that case, at least one candidate, and maybe the group, and maybe you asked for all of them, stipulated that that would not create a problem. Is that right? Yes, Your Honor. But the facts of this case and what the appellee's expert spoke to was that... When you introduced that idea with the male janitor going into the locker room, we got far, far away from the facts of the case. My question, I think, was a little bit closer. I'm trying to figure out if you have no objection that someone was going on to sex reassignment surgery in the locker room of the opposite sex. And then that was not universal with the client. That's a very... I just asked you that, and you said yes, that my representation was accurate. That was a concession, a stipulation. There were certain of my clients who said yes, a different body type in there if they were born among sex would not bother them, and I think part of the issue is that there are two things going on in this case that we need to understand. One has to do with, ontologically, what makes someone one sex or the other sex, and the other has to do with bodily privacy. To be asking the kids what makes a sex one sex or the other sex, it was difficult. They were driven for a while on those issues. But practically speaking, all we're asking for here is a return to the status quo ante from prior to 2016, which is determined on our anatomical differences. I think it's unheard to Dr. Nagle's testimony to suggest that you can go back and not know a problem, and will soon become a problem if you go back to the status quo ante, because it seems like the border... that the borders on the school seem to promulgate a policy to head off the kinds of issues that will arise if the school district were to do what you suggest, and that is to give them the suicide rates and everything else, and the impact that could have on kids whose sexual identity is inconsistent with the birth certificate designation of sex. It would create another problem, wouldn't it? Well, and Dr. Leibowitz was... Dr. Leibowitz said that the science in this case isn't evolution. He said that he doesn't look to the harms of third parties. He said that there are no studies with regard to opposite-sex usage, whether it hurts his clients or doesn't hurt his clients. He doesn't do follow-up research with his clients. But... Is there any issue about the disparate suicide rates and mental health issues between kids who are transgender and kids who are not transgender? I'm not one to make that argument. Well, we certainly need to help all students. We need to respect all students, particularly transgender students. But when you go through Dr. Leibowitz's testimony, he made it clear that much of what is important is helping those who have got gender dysphoria. But he was very clear that there was no study with regard to whether cross-sex usage of these facilities helps or hurts. You're saying cross-sex. And again, to my provincial mind, I just have to leave you with Dickens. You're going to an area that I have... It's all taken. It's all the way across sex. To my mind, that's one different situation and different set of circumstances. The way that the court has used sex... It's all the way across sex. And the court used the term cross-sex as opposed to transgender. The court has talked about one sex enough. Other sex is talked about, opposite sex. And bodily privacy turns on those things. The court has been clear that there really is a difference between the sexes based on our physical differences. I think we can take judicial notice of that. We all agree on that. There's a difference between sexes and physical differences. And so what is relevant here is the actual bodily differences. That's where bodily privacy doesn't make sense apart from the bodily differences between these two groups of people. Now, typically we... Getting back to the question that you asked earlier about the equal usage of the facilities, which again, those who are seeking privacy can only use one facility, the single-user facility. Those who are transgender can use both of the sex-based facilities plus the single-user facility. I understand the policy that once one gets permission to use the facility that's consistent with their general identity, that's the only facility that they can use other than the single-user facility. So I don't think the policy allows everyone to use everything. Well, that's correct as to any particular student. But the policy is allowing transgender students in general to be able to use either facility. Okay, so you've got transgender... You've got, again, transgender males using male facility, transgender males using female facility. And so it's not consistent even with the school's... So you're arguing that the students who have a transgender status have more rights than everybody else because they can use any facility that they want? I am saying that. That's not what I understand the policy to say. The policy says if you're a transgender student and you self-identify and want to use that facility consistent with your identity, that's the one you use. So you either use the one consistent with your general identity or the private facility. Yes. And students who are cisgender may use the facility that's consistent with their biological sex, I'm using your words, or the private facility, correct? Yes, that's correct. So everybody should do the same. Well, I don't want to be a dead horse. As any particular individual... That's the issue. Where is your position that cisgender students have a constitutional right not to share a facility or locker room with someone who is a transgender person? Sure. Pennsylvania law provides students the ability to be able to use a single-sex facility. My question was more of a constitutional issue. What's your constitutional claim having to be based on that? The general constitutional right is the ability for school children to be able to use a facility based on their sex. We understand the starting point is Doe vs. Missouri County, where this court stated that there is a 14th Amendment substantive due process right to your partially-closed body from personal deaths. Such that someone doesn't force themselves on you, surreptitiously record you. That's what was going on in Doe. That's what they were trying to do in Doe. In fact, cases like Doe, Lewis, Stronger, all those cases are cases where disparate treatment arises from and gives energy to an animus, a discriminatory animus, the result of which is to demean, to dehumanize the persons on the short end of that stick. Clearly, that was what was going on in Missouri County. People were being victimized, being molested, actually. And that's what we have. It wasn't a molestation in Lewis. It was the same kind of thing. But that's not what we have here. But there's more than that going on in the Doe case, where the court recognized that the decontamination area was one where Doe should expect a reasonable right of privacy from the opposite sex. So certainly, in every case, you're dealing with a different fact pattern. But the court was clear that first it asked, the issue here is whether one may have a constitutionally protected privacy interest, and his or her partially clothed body mentioned that it was an issue for suppression and then went on to say that they located that interest in the 14th Amendment. And so the application here, where we're dealing specifically with schoolchildren, with minors, who are in a custodial setting, who aren't there voluntarily, who are more vulnerable because of age, and where we've got a state law also that says you've got a right to use these facilities separately, it becomes an unconstitutional condition to take away the benefit of using those opposite sex facilities on these students waiving a right to follow privacy. I didn't follow it over his lifetime, but he said that he accepted most of the argument. Well, the right to privacy, we understand from Doe itself that there's a right to bodily privacy. The application in this case would be to schoolchildren. And in these particular settings, they've been set apart for them by state law to be used separately by the sexes. That's the benefit that's been given by the state. It's an unconstitutional condition factor. A benefit, even if it's gratuitous benefit, can't be conditioned on waiving a constitutional right. Here, the school is essentially saying, in order to use those facilities that have been set apart for you, you have to waive your right to bodily privacy. I'm sorry. Go ahead. Thank you. In view of the fact that the district made separate accommodations and separate facilities available, where is the irreparable harm? Sure. We would understand in other contexts. If a victim of sexual harassment, we're told, the same employee was told, hey, you're going to be involuntarily moved to another setting, we wouldn't consider that solving sexual harassment. We would just consider that institutionalizing the sexual harassment. So when there are facilities that are set apart to be used separately by the sexes, and that's then taken away, it doesn't solve the harassment by saying, go somewhere else. Mr. Robin had a sluice of words. Harassment. You're getting harassment from the presence in the same space, private space, of persons who, some of them identify with the same sex they were born with, the same sex under birth certificate, put it that way. And others identify the sex as not the sex under birth certificate. And you're saying that's where the harassment comes from, the fact that they go in the same space, and they're put there, they're using the same space, even though there are separate facilities available for the usage of cisgenders. Cisgender kids who are not comfortable there have a different, at least rest of them, are not going to have a problem. But if there are restrooms they can go to, they won't be put in the situation that you're uncomfortable. And you're saying how did that come to harassment? I'm saying when you've got a facility that's set apart for folks, and they can only use those facilities, they can only use those facilities at the risk of somebody with the opposite anatomy, so they can't use the same restrooms. There are similar-use bathrooms that can be used. Sure, but again, imagine a student that is sexually harassed in a cafeteria. Who the hell sexually harasses in a cafeteria? Sure, there's a student there who may be sexually harassing the student, and the school's response to that is, hey, let's change it on your schedule, and you might as well be in the cafeteria for a period, rather than taking care of the harassment. But I guess your position is presuming that the presence of a transgender student in the same space, either the bathroom or the locker room, is per se harassing. Somebody with the opposite biology, regardless, is per se harassing, which would be consistent with the principle that we see all over the case law, whether it's constitutional law, 14th Amendment, Fourth Amendment, whether it's discrimination law, whether it's criminal law. We see these issues pop up again and again. And I think the VMI case is particularly interesting, because there you've got one where the Supreme Court is trying to deal with the problem of discrimination between the sexes, and at the same time talks about the necessity of being able to keep the space separate, or our sister circuit courts talking about why we have separate locker rooms and restrooms on the basis of sex, and it has to do with our real bodily differences. And it's the existence of those bodily differences that is relevant to... Well, I understand that there would be a more helpful argument if we didn't have the concession that if someone was in a boy's locker room, who at that point in time physically presented as a boy, but was born under circumstances where the worst effect of that was a girl, that's when the person had gone through the sex change and sex reassignment process, there in class wouldn't have a problem. That was the concession that came to the attention of the court earlier. I think that's... What we're asking for is just a return to the status quo. That reminds me of... You could have come in during the Brown v. Board of Education and said, Hey, that wasn't impressive. We just want to go back to the status quo. It's for longer than just let's just keep the status quo. These types of abuse wouldn't happen. They happen because of changes, obviously. So going back to the status quo doesn't solve the problem because the high school obviously brought... There were some real problems with the status quo that they either wanted to head off or they wanted to address. And we're going to find out whether or not the request for an injunction that would go back to the status quo is justified. This is an injunction. It's justified because you've made a reasonable showing of irreparable harm, likely irreparable harm, or likely the success of the merits if you don't return to the status quo. And these are my questions and I think Judge Nugent's questions, Judge Schwartz's questions, are trying to get at some coherent approach to what you're asking us to do. And it's complicated by the fact that I'm asking you about the concession that your clients apparently have no problems being in a locker room with someone who is, at that time, physically present of a sex different from his own birth certificate. And to me that just seems to come down to some kind of rank, subjective judgment about that person as opposed to a type of mind issue or a privacy issue. The student doesn't know his own birth certificate. These are philosophical questions that are based on... That is a very practical question. I'm trying to keep up. Start driving this. That's a very practical question that I just asked you. If, boy A, say Jane. Jane Doe, you forget Jane. It's Callan. Abigail is the name. Abigail is in the locker room. Abigail is a cisgender girl. My understanding is that Abigail is saying that if someone comes into the locker room who is physically, at that moment, consistent with a girl, I don't mind that. But if I later find out that I'm that person's birth certificate, the person at that time of birth was identified as being male, then the point of corruption comes in. My way of privacy is being infringed upon. I'm being harassed because I'm in the locker room with someone who is a born boy and not a girl. It should be clear that the legal argument they were making has to do with our bodily differences. But they can understand that a lot of people look at the issue of what sex is and there are a lot of different answers in terms of what sex is. Can you change a sex by going through bodily changes? And so part of what was going on during that question is that Well, you actually said, yes, you can, because my hypothetical Abigail has a mind. I think I mixed that up when I presented to you. Abigail wouldn't mind being in the locker room with someone who presents as a girl, but the birth certificate says he's a boy. And that particular question objected to that. You do not object to that. The legal argument they were making is that the bodily differences are what's critical to our bodily privacy. The bodily differences, the anatomical differences, the moment the two people are in the room is what we should focus on. Yes, Your Honor. So you're saying that someone who has gone through a full transition may be in that, in the, well, the person who is transgendered to be female can stay in the female locker room, restroom, as long as that, the full sex change has happened. And the anatomical changes occur. In your eyes, is that a yes? Yes, by the logic of the argument that we're making. Well, there's a few different things that you're saying. Yes, by just the logic. It takes a lot of data, but I'm just asking you if the answer is the answer to her question. The answer to her question, yes, is the answer to her question. All right. And, again, it is the bodily differences that make a difference for how we use these facilities. Does someone go through sex reassignment procedures until they reach the age of 18? That's what the appellate's expert, Richard Furner, is saying. It's a tough question. Can they go through reassignment processes before the age of 18? Because if they can't, then you're in a house-on-riverland situation here because the situation that you're saying is okay. These high school kids can't get there because I would imagine almost all of them are under the age of 18. You are exactly correct, Your Honor. All right. Okay, thank you. You serve some time. Thank you. Okay. Good afternoon. May it please the Court. I'm Mike Levin. I represent the Boyertown Area School District, the defendant, and appellee. I want to note that the three individual school district administrators who were named as defendants have been dismissed by agreement of the parties, and the school district and the intervener are the only appellee parties. Let me verbalize what my body of language was that Judge McKinney observed. Judge Schwartz was 100% correct that under the practice of the school district, once a transgender student has asked to use either the bathroom or locker room that is consistent with their gender identity, they are not allowed to flip-flop and go back. And also, as Judge Schwartz alluded to, there is a transition period. These things don't happen overnight. What do you think you're referring to? The transgender transfer. So a student could be transgender and not yet be ready to use a bathroom or a locker room consistent with his or her gender identity. Judge Schwartz, are you saying that's coming from the view of his testimony? Correct. And partially also from in DiStefano where he described his transition. So it comes from both of those things. And typically, and in some of the other courts, in fact, the Grimm decision which was issued two days ago is an excellent summary of the case law as well as the issues of transitioning with respect to transgender. The students typically start with things like changing their name from feminine to a masculine name. They may start hormone therapy, et cetera, and then ultimately they get to the position where they want to transition into using the bathrooms or locker rooms consistent with their gender identity. And this process at Boyertown, the student has to work with his or her guidance counselor, and the guidance counselor, working with the administrators, ultimately will give approval at the appointment. Are they special guidance counselors in terms of having a special background or special training or selected because of their unique sensibility in this area? My guidance counselor was also my high school history teacher. He was terrible at basketball. He was wrong in all three areas. Is it something like that? You've got to have enough salaries to bring somebody in and make them a guidance counselor? No. In order to be a guidance counselor in Pennsylvania's public school system, you have to be properly educated and properly certificated. You cannot be a counselor if the only certification you have is history or math or any of the other academic subjects. So it is a specialized situation. As the court is well aware, the plaintiff's case in this case is based upon two legal constructs. One is constitutional right to privacy and the other is the alleged sexual harassment in violation of Title IX. We do not believe that this case meets either of those definitions for the primary reason that there are private spaces available in terms of special locker rooms, single-user bathrooms, et cetera. So you're conceding that there is a right to privacy because the existence of these alternative facilities would only be implicated if there was a compromise of the privacy right. For the purposes of this case, I don't know that you need to make that concession. But if the school district recognizes it- I'm not suggesting you want to make it or you don't want to make it. I'm not suggesting you need to. It's your choice. I'm just wondering. Robert, when you jump right to the alternative facilities, we would only guess there was a privacy right that should be recognized. Well, there are certain privacy implications. That cannot be denied. But the plainness articulation of the privacy interest is very unusual because they're saying that they have a right to privacy to go into rooms that are inherently not private.  They're not shielded from view from other people, nor are they shielded from seeing other people. Well, I thought you put in shower stalls in the, quote, locker room, which show that they are now actually individualized. The shower stalls are individualized, but the group or communal locker room is not. As we all remember, the United States Supreme Court indicated that the level of privacy in a locker room is different than other kinds of privacy. So I can see that there is something that has to do with privacy, but it is met by the fact in this case of the separate locker rooms of the single-user bathrooms. I just want to go back to what you said before you talk about the rights of privacy being met by these alternative avenues. I thought what you were also saying was you think the definition of the right that's being described at a place that's far broader than would be recognized in part because the facilities at issue, in this case the locker rooms and the multi-user bathrooms, are not private in the sense that you can expect. You have an expectation of privacy that no one will be there, but they're in public buildings, first of all, but you expect other people to be there. Is that your position? Correct. I just want to jump the top of my head for a second. My question really has to do with the rescission in 2017 of the Dear Colleagues letters in 2015 and 2016. Does that affect anything, given the district court's opinion or your position in this case, the rescission of those letters? It doesn't affect the legal analysis in any way. Factually, the school district made their decision administratively after the Obama 2016 letters, so from a factual standpoint, that's the only relevance. From a legal standpoint, we're not relying on that in any way. But to get back to the plaintiff's privacy argument, they inject several other aspects of it. They're going to privacy. They combine with their alleged constitutional right to go into the communal bathroom and the communal locker rooms rather than saying, okay, like any other person, we can choose whether to go there or go into the private locker room and single-user bathrooms. So now they're combining what's really not privacy into a right that they have to be able to go into the communal rooms, and there's nothing in the law upon which that is built. Then they go one step further. They want to define who can be in the room, and their definitions of sex have changed over time in this case because they have realized, I believe, that some of their definitions of sex don't stand up to logical scrutiny. If you look at paragraphs 28 and 29 of their amended complaint, they define sex differently. Where is the appendix? I don't have that with me. Paragraph 28 of the amended complaint, quote, the term sex refers to one's biological slash anatomical status as either male or female, end of quote. Well, if that is the definition, getting back to some of the comments and observations you made, Judge McGee, when there's surgical intervention, you change the anatomical status of the individual. Three of the original four plaintiffs were unwilling to have that person sit in the locker room with them. One of the plaintiffs, as was referred to by the court, was willing to have that person, so they're not even in unison about does anatomy matter. You then go to paragraph 29 of the amended complaint, where they say sex is fixed at conception, binary, objectively verifiable, and rooted in our human reproductive nature, and many of the cases have talked about the problems associated with that definition. But the plaintiff's logic has eroded and the foundation of their argument has eroded even further to the extent it is based upon this concept of sex, because in footnote number two, they change the definition of sex again. In that footnote, they said, quote, Appellants use sex as referring to male or female as grounded in reproductive biology. Sex is binary, fixed at conception, and objectively verifiable. That's not consistent with one of their own clients, but that is what they are saying now. In contrast, we suggest that the transgender students, when they have gender identity, meet the definitions of sex, and if the school district were to do what the plaintiffs want them to do, I believe that the school district would be met with the political, the legal challenges that others who have excluded transgender. I don't have to remind the court of the North Carolina bathroom bill and how the country reacted to that, how the courts enjoined that, and how the state ultimately rescinded the main emphasis of the bathroom bill. Pittsburgh University of Pittsburgh, which was one of the first cases dealing with transgender rights, Judge Gibson ruled in favor of the university that the transgender student did not have the right to use the bathrooms or locker rooms of his choice. Pittsburgh University settled that case and allowed the student there. Pine Ridgeland School District, same thing. They adopted a rule consistent with what the plaintiffs would want them to adopt. They were sued. The judge enjoined the rule, and that school district settled the case and allows transgender students to use the bathrooms and locker rooms with which they identify. Myersville School District... That doesn't help us. That really doesn't help us deal with their title IX or privacy violation in this case. Are you trying to say that if you went back to the status affairs before the policy, the school would be opened up to equal protection claims by the transgender student? No protection. How does the law balance the protection considerations of the transgender student against what these plaintiffs contend are privacy interests of the cisgender student? The school district did it by offering private facilities available, and I think that the analysis in the Pine Ridgeland case is right on, and that is all students get to choose which bathrooms or locker rooms they want based upon their gender identities. And it applies equally to both sides. Anyone who has privacy concerns can use privacy. It's a little different than that because a student just can't come in, as you said, and say, well, I want to use the bathroom or the other section I know identified with them. It's just not that simple. There's a process put in place and servicing by trained professionals, licensed professionals as to when that can occur so they can spend money. The last point I would like to make is the arguments made by the appellants about transgender folks simply having a subjective belief. The following is a fact by the court below, as well as testimony. I didn't hear that. It's in the briefs, but that didn't hit the argument today. There was more to it. The expert made it clear that these are more than simply subjective ideas. They're core beliefs, and it may last over time. And the judge found those facts based upon that testimony. Unless the court has any other questions. Thank you very much. Do I have any questions? No, I have none. Thank you, guys. Good morning. Good morning. Good day. Good day. Always the same choice. I'm Maria Mar from the American Civil Liberties Union, and I represent Intervenor Appellee, the Pennsylvania Youth Congress. Plaintiffs ask this court to do something extraordinary, tell a school district that it is constitutionally prohibited from continuing to allow transgender students to use the facilities that match their gender identity, a practice that has been in place for nearly two years. The district court did not abuse its discretion in denying that unprecedented request at the preliminary injunction stage. As the district court found based on unrebutted expert testimony, excluding transgender students from facilities that match their gender identity can disrupt their education, cause significant psychological harm, and deeply stigmatize them. Can I ask you a question? In some of the other cases where the plaintiff is the transgender student seeking access, among their complaints when schools or institutions say, well, you can use the private facility, is you're stigmatizing me, you're treating me differently. Why isn't that the flip? Here we have the cisgender students who have expressed concerns about their privacy telling them, well, you can use the private facility. Why aren't they also having the same arguments or the same type of arguments as the transgender students when they serve at the facility? It's very different, Your Honor, for at least two reasons. The first is when it comes to students who are transgender, many of these students have gender dysphoria. And Dr. Lieber has testified in the district court found that gender dysphoria is defined as clinically significant distress. And that distress can be alleviated when students are able to use facilities that are consistent with their gender identity. It can also be exacerbated when students are excluded from those facilities and can lead to serious psychological harms of the kind that Judge McKee indicated earlier. That's not the case when we're talking about cisgender students who do not suffer from gender dysphoria. So the differential in treatment is the impact on the particular person. It's more, you know, documented, serious, et cetera. There is a serious clinical distress involved. There's another reason as well, which is for the plaintiffs, right? There's a profound difference between choosing to use single-user facilities because of one's own belief about modesty or any other reason and being required to use those facilities because of someone else's belief that who you are, your very presence is unacceptable. And that stigma, that differential treatment is why it's discrimination in cases like the Grimm case, right? To exclude a student and tell them that they are unfit to even be in spaces where other people are present. How much of that is going on here? Now, you said you didn't answer that. You didn't answer this completely to the record. But some of the argument that was suggested that I read, that's why I used the term animus before, that there's a distinction between cases like the Zurn County and the Hideaway case, the Turnbull case, where there's clearly an animus driving the policy that separates, as opposed to a policy that seems to be based upon clinical recognition of a real problem and how you head that off in the context, the very delicate and sensitive context of adolescent kids. You're absolutely correct that there's an important difference. And as the school district counsel explained, the district initially had made this decision to adopt a policy of inclusion following the Obama Dear Collar letter, but it voted after the rescission of that guidance to continue the practice after having nearly a full school year of experience with it and seeing that that practice was good not only for transgender students but for the school as a whole. I think the amicus brief from school administrators really speaks to that experience that adopting policies of inclusion can be a valuable thing for all students. So not only is there not an animus towards the cisgender students, but really there's an interest in promoting the well-being of the school as a whole. Contrasting the significant harms that transgender students might experience when they are excluded, the district court made a factual finding that there is no harm to plaintiffs here, and plaintiffs have not challenged that finding as clearly erroneous, and they can't because they admitted before the district court that the single-user facilities would protect their privacy. Students are not required to change in the locker rooms. They may use the single-user restrooms to do that, and in fact the school has equipped some of those restrooms with lockers for students to store their belongings during gym. There are also private spaces within the locker rooms, so the individual shower stalls Your Honor referenced earlier, those are spaces that students do use to change in the locker room. They simply pull the curtain and can change. There are also individual toilet stalls within the locker room that students may use to change as well. So there certainly are private spaces available for any student who wishes to use them for any reason and who may feel uncomfortable changing in front of others. We know everyone has their own sense of personal modesty. One of the plaintiffs, Jack Jones, testified even before this practice was adopted, he tended to prefer to change in an area of the locker room that was less crowded, and that makes sense because it makes sense that some students may feel uncomfortable, and the school has addressed that by making a variety of options available to all students. There's nothing unconstitutional about that. In fact, not only is the district's choice legally and constitutionally permissible, but as Judge Schwartz has anticipated, courts are increasingly recognizing that practice is required under both Title IX and the Constitution, and that means that granting the injunction that plaintiffs have asked for here would actually violate Title IX and the Constitution, and that's another reason why it was not an abuse of discretion for the district court to deny it. We've heard a lot today about the definition of the word sex, and I just wanted to add a few comments to that conversation. First is when it comes to sex discrimination, the Supreme Court has used the word sex and gender interchangeably, and I think the VMI case, which opposing counsel referenced earlier, is a terrific example of that. You see the court using the word gender when it talks about sex discrimination under the Equal Protection Clause. But more importantly, this court doesn't need to define sex to affirm the denial of plenary induction. As Judge Nygaard indicated, there simply is no irreparable harm here. The district court found, and the plaintiffs haven't contested, that using single-user facilities would protect their privacy, and their only argument for irreparable harm stems from the idea that their harm can be presumed based on the constitutional violation. But as the questioning earlier indicated, of course, they have not established a violation of their constitutional right to bodily privacy for precisely the same reason, which is that they are not required to expose their intimate body parts to anyone. They're able to use those single-user facilities. So based on that finding that no student is required to undress in front of any student of any gender, this court can affirm on that basis alone. There was also a question earlier about whether there is a constitutional right to bodily privacy that I think applies to the school locker room context, and our answer to that question is yes, there is a right to be free from the involuntary exposure of one's own body parts, and that applies whether we're talking about students of the same sex or students of a different sex. The key here is that no student is required to expose their intimate body parts in front of any student of any gender. They're certainly not required to strip down nude and remove their undergarments. In fact, the testimony here was that very few students, if any, do undress fully in the locker room. Very few students shower. And for those who do, those facilities have been replaced with individual shower stalls. I'm going to address a very good point, which I hadn't contextually or extensively given. I hadn't articulated it quite the way he did, and that is the right to privacy is being asked for to a state that is, by definition, not private. It doesn't mean there's not a right to privacy, but it certainly informs the conduits of that right and the scope of that right and what can be done even given the most severe test that we apply to fundamental rights. It informs how we view the substantial interest test in the fundamental right inquiry. I'm sorry to interrupt you. No, that's absolutely correct, Your Honor. This is not a Fourth Amendment kind of right to privacy. That's correct, Your Honor. And I think this court in Luzerne County articulated the right very much the way Your Honor did, which is to say it's a context-specific inquiry. We have to look at the circumstances. The court said we're not going to draw a white-line rule. We're going to look at the circumstances, and the circumstances here are students changing for gym alongside other students, which is precisely the way the facilities were intended to be used. That is a very different thing from the Fourth Amendment context, and I think the Supreme Court has recognized that in the case of Stafford v. Redding, which involved a strip search of a young girl, and the court talks about the vulnerability and the exposure and explicitly contrasted that exposure from the type of exposure that's involved in changing for gym class in the locker room, which is simply a very different thing than what's involved in many of the plaintiff's cases, which involves coercive settings or hidden cameras or peepholes or things of that nature. There was also a conversation earlier about legislative intent, and many of the points have been made, but I just wanted to add that there's no reason to think that legislators in 1972 would have thought that a transgender student like Aiden DiStefano should actually use the girls' room and not the boys' room. So I think the absence of consideration of gender identity in 1972 simply doesn't cut the way Mr. Wenger thinks it does. I also wanted to address the plaintiff's selective reliance on anatomy. We heard today, earlier, articulated the Bright Line Rule for the first time, the idea that someone who has undergone a full transition may use disabilities. That's the first time we've heard that articulation, and accepting that as their position today, I think it's wrong for at least two reasons. It's wrong as a matter of law in that our rights can't be conditioned on any particular medical treatment, and the EEOC has articulated this very well in the Lusardi case, which addressed the question of whether excluding a woman who is transgender from restrooms and lock rooms in an employment context is sex discrimination prohibited by Title VII. And in holding that it was, the EEOC very clearly stated that the employer in that case, which had said that Tamara Lusardi could not use the restrooms until she had completed the final surgery, and I use Eric's hair quotes there because, of course, there's no such thing, and also because the employer never articulated what precisely that surgery was. But the plaintiff's right to be free from sex discrimination can't be conditioned on any form of medical treatment. I also think it's problematic in the social matter because it's... I was wondering to what extent the concept of a heckler's veto is kind of lurking around, at least in my mind, in cases like this. You don't have to address it, but I'm just... I can't keep that thought in mind. It's very similar to the heckler's veto concept in the first amendment context. I think the plaintiff's suggestion that it's their discomfort that therefore translates into a constitutional right to banish others from common spaces is quite troubling. Well, not a heckler's veto that I'm just talking about. That's absolutely correct, Your Honor. I did want to just address what I think is wrong factually about the notion that someone who has undergone a, quote, final surgery or a certain set of procedures can then use facilities. And that's what Dr. Leibowitz testified. The condition is a process. It can involve the adolescent's puberty blockers. It can involve hormone treatment. For some students, there are some surgical interventions that may be appropriate, although typically those are not recommended before age 18. They sometimes may be. And so it's not a black-and-white matter. And our sex-based characteristics may not all align. I think there's a very nice discussion of this in Tuesday's decision from Judge Wright-Allen in the Gavin Grimm case where she talked about the various steps that Gavin has taken over time since his case was filed several years ago. And we see that all of the sex-based characteristics have changed. And at any particular given snapshot, you might have someone who's using a male name, who's using male pronouns, who, when he's in public spaces, uses the male restrooms and no one backs an eye, who then was able to undergo chest reconstruction surgery and correction and updating of his gender identity documents. And so, you know, at what point do we get there? And I think the answer is to do what the district has done, is take a case-by-case basis and say, okay, we're going to work with the students and the guidance counselor to figure out, you know, what is the right choice for this student and which facilities are most appropriate for that student to use. And that rule, I think, not the bright-line rule that plaintiffs asked for, is the correct one. As was alluded to earlier, the simple presence of transgender students in restrooms and locker rooms does not violate anyone's constitutional right to bodily privacy. And, again, the right there relates to the involuntary exposure of one's own intimate body parts, which was involved in the Lutheran County case. Here, of course, no student is required to expose the intimate parts of their body, both because of the private areas the school has made available and, in fact, the students have admitted that. It's also important to recognize that, you know, up until today, the students have not been objecting, in fact, to seeing any particular anatomical parts or to nudity. In fact, what their objection is is to the very presence of transgender people. And we see that. One of the plaintiffs, Mary Smith, the basis of her complaint is that she entered the girl's restroom and saw a girl who was transgender washing her hands of the sink. I think that example illustrates so powerfully why this case has nothing to do with privacy or nudity or anyone's intimate body parts. It has to do with an objection to who transgender people are. And the way this has been played, there's no allegation that private parts have actually been viewed. It's the presence. You're right about that. But the next case will, Mr. Levin's point, if we were to go back to what Mr. Levin would have asked for, I'm not suggesting, as a matter of law, whether we will or not. We haven't decided the case yet. But the next case, in fact, would involve that. It would be played differently because it would be a situation where there is actual nudity. So that, at least from my perspective, I kind of disagree. The decision coming out of this to the very narrow confines of the person's presence in the locker room just kind of kicks the hand down the road. It doesn't really help as much. Well, you're right. I think that's right. But it's also true that the plaintiffs are claiming not just the right not to be seen, but I think what your question or your concern is getting at is the right not to see others. And that, there's no case that supports that broad and novel reading. But the right to one's own bodily privacy protects against the right not to see others. So here, would this case be different if the facts were that, instead of the student being seen partially changing for gym, was about ready to enter the shower and so their bathtub is exposed? Would your position be different? No, because no student. I think I understand the question, so I'll try to answer it. And you tell me more if needed. Even if there were a right not to see others, plaintiffs, again, can avoid seeing other people changing by using the single-user facilities. So that interest is not implicated as well. I also think it's important to recognize, because there are concerns about intimate body parts being exposed in school areas, the school is free to address those concerns in a non-discriminatory way. They might, for example, adopt the policy that students may not fully undress in private areas and reveal intimate body parts in front of others, and anyone who wishes to do that use a private area. So the solution is not to banish transgender students from common facilities. There are common-sense solutions that school administrators are well-equipped to come up with to address the real concerns. But again, those are not the concerns in this case. So you're not suggesting that if the policy were to change to require transgender kids only, to change in a way that does not show their bodies to other people who are present, is that possible? You're not suggesting that, are you saying? No, I'm not. Thank you for the clarification. I think the key there is that the school is free to come up with solutions that are non-determinatory, the solutions that apply to everyone. And again, you know, Dr. Lieber has testified, and the district court recognized students may be uncomfortable seeing nudity, whether it's someone of the same sex or someone of a different sex, whether or not transgender students are present. So the school might decide to address those concerns by adopting a policy like the one I described, but of course what it can't do is subject transgender students and only transgender students to differential and adverse treatment to suggest their very presence is unacceptable. Turning to the statutory claim, transgender students using the same restrooms and locker rooms as everyone else also did not amount to sexual harassment. The only courts that have addressed similar claims have rejected them. The first decision is the 2002 decision from the Eighth Circuit in Kruzan, which involved a teacher who complained that her school had created a hostile environment based on sex by allowing another teacher who was transgender to use the women's restroom. And the Eighth Circuit said that the mere presence of that teacher, who was not alleged to have done anything other than simply use the restroom, did not rise to the level of a hostile environment and was not sex discrimination under Title VII. And of course the district court and Students and Parents for Privacy, the Northern District of Illinois case, the plaintiffs there raised an identical Title IX claim, and both the magistrate judge and the United States district judge have rejected it. Whatever plaintiffs' subjective experiences in the locker room or restrooms may be, the district court found there is nothing objectively offensive about going about daily life while being transgender. And of course we talked about the severe or pervasive standard earlier, but not the other element, which is that not only must the conduct be severe or pervasive from one's own perspective, but it also must be objectively offensive. There's nothing objectively offensive about using the restroom while being transgender. What is offensive is comparing being transgender to the outrageous conduct involved in many of the cases that plaintiffs rely on, like a peeping Tom glaring at a child, or the Shona Arcade's Judge McKee reference earlier where a supervisor demanded that his employee dance nude. Plaintiffs can point to no case that has found a sexually harassing environment based on another person simply using the facilities that they were meant to be used, regardless of the sex of the people involved. I did want to touch also on this notion earlier that not only is the district's practice permissible, but it is in fact required as an increasing number of courts have recognized, because sex discrimination includes discrimination based on transgender status. That's because it's impossible to take into account the fact that someone is transgender without taking into account their sex assigned at birth. So it's inherently sex-based. Being transgender also is a form of gender nonconformity under the Price-Waterhouse decision, because being transgender defies a sex-based stereotype that all of us should identify with the sex we were assigned at birth. Courts are increasingly recognizing that excluding transgender people from facilities that everyone else uses is a form of sex discrimination. It's a form of discrimination that marks transgender students and only transgender students as unfit to even be in the same place as other people, simply because of who they are. The injunction that a plaintiff seeks would itself violate Title IX and the Constitution. Finally, we've not talked about the tort claim at all, and I would just briefly add that there are tort claims failed because they have no reasonable expectation of being secluded from others, for the same reason that seclusion is not about anyone's sex or gender, but rather the expectation of being alone. And there's no expectation that one is alone in a crowded locker room, where the district court found up to 60 students may change for Jim at the same time. If there are no further questions, we ask this Court to affirm the order of the district court. Thank you. The school has conceded that locker rooms are not private by nature. But let me explain the privacy. Locker rooms have been set up not to have privacy at the door from persons of the opposite sex. Those who you're changing with, you don't expect privacy within the common areas of the facility, because as the testimony is in this case, there are students who change their clothes, sometimes getting completely naked within those facilities. And that says the opinion below that essentially states that. I think that's something that should be considered over there. We said, and I would agree with you, that once you get inside the locker room, the door was closed, but the folks who were in the locker room, and then the folks outside the locker room, there's no expectation of privacy amongst those folks. There's a lot of privacy in there. Well, it's why we separate facilities on the basis of sex in the first place, the bodily privacy right. But you said there wasn't a right of privacy in that room. Not to persons of the same sex. To persons of the opposite sex. That's why we divide it on the basis of sex. If it weren't for the bodily privacy differences, we wouldn't have separate facilities at all. We'd have one big changing area. But it is those bodily differences that have an interest strong enough to say, even though we prevent discrimination on the basis of sex, we are still going to maintain separate facilities because of the physical differences between men and women. So the school has succeeded that a cisgender male is not permitted to enter the girls' locker room. Once they've decided if they're going to go into the boys' locker room, they can't go into the girls' locker room. I'm sorry, I moved that. A cisgender female can't go into the boys' locker room. A cisgender male is not permitted to go into the girls' locker room. And the converse is true. Correct. And it's based on biological differences. The principal for the school recognized that the reason there was a separation of facilities is because of the privacy that's to be afforded within those spaces. But what was the meaning of privacy? Let's talk about that, right? There's a Whitaker case out of the Seventh Circuit. The court makes a statement that says, A transgender student's presence in a restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex. My difficulty with part of your argument is you have a transgender student who is interested in nothing else than taking care of whatever one is doing, either in the locker room or the restroom, and that presence is infringing your client's rights. But you're saying, I guess, a student who's of the same biological sex but overly curious would not violate their rights? There's a right to bodily privacy. Let me answer that question first. That includes the other health. It may violate the rights for different reasons. There's the same privacy interest, though. Someone in their body, they have the same bodily integrity, the same privacy interest, and you're saying the transgender student poses a greater risk to violating that right than an overly curious cisgender student. Because their right to privacy depends on their bodily differences. And so, in that context, if there's a cisgender female in there being stared at by another cisgender female, that's okay. But if a cisgender female is in there and there's a transgender female walks by, and in both these cases, everyone is totally nude, the transgender female just walks by and doesn't pay much attention, you're saying that because of the bodily differences, there's a violation in the second situation where the transgender female is not even paying any attention to the cisgender female, but in the first situation where the cisgender female is staring, and walking at the cisgender female who's in the first room, that's okay. I don't think it's okay, no, Your Honor. But in the constitutional legal sense, the right of privacy sense, that's not a infringement of the right of privacy, of the cisgender female who's in there being walked at. Because that's where your argument takes you. I'm not sure what the cause of action is here, Your Honor. I haven't... I don't think that anymore. But that's where your argument takes you. The right that we're bringing here has to do with bodily differences, and the only reason that we have these separate facilities in the first place, and... That's why the hypothetical that's posed to you eliminates that issue, by putting people in the space of the same birth sex. Sure, and so it doesn't cause a problem for the same reason. The walking very well may be a reason that there's a violation, not the bodily privacy because of the bodily differences. So I'm not saying that there's not a cause of action for that. That's not one that I've been investigating. The one that we're founding this on has to do with the right that's existed precisely because of the bodily differences. And to be clear, my... The privacy interest is exactly the same though, isn't it? Maybe there's some tort there that I can't go harass with someone like that. Maybe there's some tort action in there. Well, the privacy action is exactly the same as the privacy interest. I'm not saying that there are different ways to get to that privacy interest, but the privacy interest that we've been talking about is based on the bodily differences. And to be clear, we're not opposing using the room with transgender students, as long as those transgender students are of the same biological sex, it's the same body type, so our clients... That would buy me again because now I'm totally confused. Okay. What did you just say? It's not opposing... Well, what we're saying is our clients have testified that they will use the space with transgender students. Well, so who is it? That company is it? Are you objecting to that use? No. Okay, go ahead. No, not at all. Yeah, no problem with... Right, and... So it's his... Let me just be more specific. A cisgender female plaintiff would be fine sharing a facility with a transgender male. That's correct. Because they're anatomically alike. Exactly. And so the statement you heard earlier, that there's a feeling of some sort of hatred toward transgender students and their presence is objected to, all that's being objected to is sharing the facilities with somebody with the opposite body type. And I'd like to point out as well the implications of this. If we say that body type really doesn't matter, instead... Wait, who is saying that the body type doesn't matter? You heard Mr. Levin talk about the process they've put in place, the licensed spokesmen, the trained professionals they've hired to deal with this. Who is saying that body type does not matter? It's how you address it and how you respond to everything involving women and the body type and some of the gender identification issues that arise from that. What we're saying at the end of the day is if somebody goes to the school and says, can I use the opposite sex facility, the school says, yes, if you want to use the opposite sex facility, who is saying that? If somebody comes in off the street and says, first of all, somebody off the street wouldn't be in the school, they don't have the right to be in the school, and they just say, I don't want to use the opposite sex facility, you're going to get a 911 call. I'm talking about students. If a student asks to use the opposite sex facility, all they need to do is ask the administration. The administration will ultimately, for every student who has asked that, What you're telling me is that what Mr. Levin just represented to us, which is consistent with the District Court's findings of fact, is not true. There's pros and cons to this. Any student, forget the stranger off the street, they don't have a 911 call anymore. Any student can go into whichever office it is, the office of the principal, I didn't identify myself with the opposite sex. Okay, so any transgender student can come in. Sure, but the logic of that would apply, if we're saying that the biological sex of the students don't matter, the logical implication is the biological sex of a teacher doesn't matter, if a teacher is doing a strip search, for instance. So the appellees have been making a lot, We'll go back to analogies like the gender that goes into the rest of them. I totally got lost with that analogy. Try it again, because I'm not sure I follow your argument. Sure. The implication of saying that the biological sex doesn't matter if you identify with the opposite sex would apply as well to a teacher, for instance, who needs to conduct a strip search within the school. We always do strip searches with some of the same sex in order to protect bodily privacy. The logic of this would be that the subjective beliefs... So you're putting someone going to a bathroom or someone taking a shower in places at appropriate times for doing that is the same as the kind of interaction that one has when we do a strip search? I assume those two interactions are the same? I imagine that someone in the locker room or the bathroom or the shower is the same as someone doing a strip search. I'm saying that the logical implications are the same. Why are they the same when the nature of the activity, the nature of the intrusion and the interaction is totally different? Because once we say that sex is our gender identity rather than biological sex, that naturally follows. Well, I don't know if naturally follows is different from mine. It seems to me that's a wholly different scenario. It might require a very different policy, probably a very different lawsuit if that was the case. But I have to think about that analogy because I just equate those scenarios the same as you do. Your Honor, I see that my time is up and I thank you for your time. Thank you. You said that we always have seen that those folks have nothing to do with a court-run procedure. We've seen in the prior cases of civil treatment that are under advisement. Usually when that happens, we decide and we calculate the case right away as we always do, and an opinion comes out when the opinion comes out. I don't know when the graduation is for the high school, but whenever it is, this is quite a matter that's of great importance to high school administrators, to kids on both sides of this legal issue, and to the parents on both sides of the legal issue. To the extent that we can, we may not be able to. But to the extent that we can, and we talked about this part before, I want to try to comment on the case now. No one down on that website, but let's reconvene in no more than 30 minutes. To the extent that we can reach a decision, we'll render a decision. It won't be obviously a thorough analysis or anything like a legal opinion, although some of my colleagues will probably think that my opinion is very wrong. But we can at least, hopefully, let you know how we stand on the issue before us, that is, the motion for preliminary injunction, and if we can't do it, we can't do it. But we can at least have a split from this.